UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

NIAGARA BLOWER COMPANY,

        Petitioner,

        v.                                               16-CV-262
                                                       DECISION AND ORDER

SHOPMEN'S LOCAL UNION 576 OF
THE INTERNATIONAL ASSOCIATION
OF BRIDGE, STRUCTURAL,
ORNAMENTAL, AND REINFORCING
IRON WORKERS,

        Respondent.

---

On March 31, 2016, Niagara Blower Company ("Niagara") petitioned this Court to vacate the arbitration award that reinstated John Beller as a Niagara employee. Docket Item 1. On July 22, 2016, this Court referred this matter to United States Magistrate Judge H. Kenneth Schroeder, Jr., for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B). Docket Item 13.

On November 3, 2017, Judge Schroeder issued a Report and Recommendation ("R&R") recommending that this Court grant Niagara's petition to vacate the arbitration award and deny the union's counterclaim to enforce the award. Docket Item 19. On November 17, 2017, the respondent, Shopmen's Local Union 576 of the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, timely objected to the R&R. Docket Item 20. On December 15, 2017, Niagara responded, Docket Item 22, and on January 1, 2018, the union replied, Docket Item 25. This Court heard argument on January 26, 2018. Docket Item 26.

As discussed below, this Court finds that the arbitrator's decision was rooted in the authority granted him in the collective bargaining agreement ("CBA") between Niagara and the union. For that reason, the Court disagrees that the arbitrator improperly reinstated Beller, declines to adopt the R&R, and denies Niagara's petition to vacate the arbitration award.

## **BACKGROUND**

On March 6, 2015, Jon Beller arrived at work over two hours late—at a quarter to eight in the morning—under the influence of alcohol. Docket Item 1-7 at 3. Beller started his work as a welder, and at about ten in the morning, his immediate supervisor detected the odor of alcohol on his breath. *Id.* The supervisor reported Beller's condition to the plant superintendent, who contacted Niagara's human resources manager. *Id.* The human resources manager contacted the parent company, Alfa Laval, and called a taxi; Beller then was taken to Healthworks WNY for drug and alcohol testing. *Id.* Around a quarter to noon, an alcohol breath test was administered, and Beller registered a .009% blood alcohol content ("BAC"). *Id.* at 4. Three days later, on March 9, 2015, Niagara terminated Beller. *Id.* at 5.

The union properly grieved Beller's discharge, and Niagara denied the grievance at every stage. *Id.* The union then submitted the grievance to an arbitrator as required by the CBA. Docket Item 19 at 2. After two hearings and briefing by the parties, the arbitrator found that Beller was terminated without proper cause and issued an award reinstating Beller but disciplining him with a 15-day suspension without pay for coming to work impaired. *Id.* at 4.

2

## I. ARBITRATOR'S OPINION AND AWARD

The arbitration took place before arbitrator Thomas N. Rinaldo, Esq., and the parties raised the following issue for resolution:

> Was the discharge of John Beller for proper cause? If not, what shall the remedy be?

Docket Item 5-2 at 17. After two days of hearings, the parties submitted post-arbitration briefs, and Rinaldo issued his opinion and award on January 3, 2016. Docket Item 19 at 4.

In his opinion and award, Rinaldo found that Beller had arrived at work and began working while intoxicated. Docket Item 1-7 at 21-22. Rinaldo accepted the testimony of Niagara's expert, Dr. Mark Costanza. *Id.* at 20. As noted above, Beller had registered a .009% BAC during the breath test, *id.* at 4, and Dr. Costanza extrapolated that Beller's blood alcohol content would have been .09% when Beller had reported to work four hours before the test. *Id.* at 20. Accepting that testimony, Rinaldo concluded that Beller had reported to work while under the influence of alcohol. *Id.*

Nevertheless, Rinaldo found that Beller was terminated without proper cause. *Id.* at 21-22. Rinaldo acknowledged that Niagara's "Plant Rules" (1) prohibited working or coming to work while impaired and (2) warned that a violation could result in immediate termination. *Id.* at 17-18. Rinaldo also noted that the CBA required Niagara to have proper cause for termination, but that proper cause had not been defined in the CBA. *Id.* Therefore, in light of the questions presented to him by the parties, Rinaldo first addressed whether Niagara had proper cause for Beller's termination.

Rinaldo found that there was no evidence in the record that Beller's behavior "reflected any of the tell tale [sic] signs of intoxication, being impaired, or under the

3

influence. . . . Nor [was] there any evidence in the record that [Beller's] work itself was substandard, careless, or deficient in any other way." *Id.* at 19. Because Niagara had not shown that Beller's behavior or work actually was compromised, Rinaldo found that Niagara did not have proper cause to terminate Beller. *Id.* at 20. In other words, Rinaldo found that Beller could not be terminated only for working while impaired. Having determined the termination was improper, Rinaldo addressed the second question posed by the parties and decided that Beller should be reinstated but suspended 15 days without pay to punish him for his misconduct. *Id.* at 21-22.

## II. PLANT RULES

Niagara argues that because the Plant Rules clearly state that Beller's violation—working while impaired—could result in immediate termination, Rinaldo did not have the authority to review the termination for proper cause. Docket Items 1 and 23. Stated another way, Niagara claims that Beller's violation of the Plant Rules necessarily was proper cause to discharge him. Niagara bases its argument on Section 6(B) of the CBA. *Id.*

Section 6(B) provides Niagara the authority to "***establish, maintain and enforce*** reasonable rules and regulations to assure orderly plant operations," as long as those rules do not conflict with the other provisions in the CBA. Docket Item 1-3 at 11 (emphasis added). Following Section 6(B), Niagara drafted the Plant Rules that govern Beller's workplace. The rules outline various violations, assign points to each violation, and describe the potential disciplinary actions associated with different point ranges. Docket Item 1-4 at 1. The more points, the harsher the discipline. *See id.*

The Plant Rules include a number of violations under the heading "INTOLERABLE VIOLATIONS—Termination." *Id.* These violations are described as offenses that are "subject to immediate termination." *Id.* Included on the list of actions that "may result in immediate termination" is "working while impaired by alcohol or drugs." *Id.* at 2.

Because the Plant Rules explicitly provide that working while impaired by alcohol may result in termination, Niagara argues, once the arbitrator found that Beller reported to work intoxicated, he was compelled to find that Beller was discharged for proper cause. Docket Items 1 and 23. Judge Schroeder agreed with Niagara in his R&R. Docket Item 19. But for the reasons discussed below, this Court disagrees.

## III.     LEGAL STANDARDS

### A.     R&R

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). A district court must conduct a de novo review of those portions of a magistrate judge's recommendation to which an objection is raised. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

### B.     Arbitration award

When parties to an agreement bargain for an arbitrator's decision, that bargain may not be upset by a court simply because it deems the decision incorrect. ***The court may not substitute its view for that of the arbitrator nor may it even review the award for clear error.*** When an arbitrator explains his conclusions in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result.

*Saint Mary Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 44 (2d Cir. 1997) (emphasis added) (citations, quotations and alterations omitted). In other words, if Rinaldo acted within his authority under the CBA—framed by the questions that the union and Niagara agreed were before him—then this Court cannot disturb the award. *Id.*

## DISCUSSION

When an arbitrator is bound by a CBA, the arbitrator's award must be grounded in its provisions. The arbitrator "is not free merely to dispense his own brand of industrial justice." *Id.* at 44 (internal quotations and citations omitted). Instead his charge is to make an award consistent with the terms of the CBA.

Here, the CBA gave Niagara the authority to establish, maintain, and enforce reasonable rules for the plant. On the other hand, the CBA did not give Niagara the authority to prescribe the appropriate punishment for violating those rules. In fact, the parties acknowledged exactly that when they asked arbitrator Rinaldo to decide whether "the discharge of John Beller [was] for proper cause" and, if not, what the appropriate remedy should be. Therefore, Rinaldo acted within the authority granted him when he answered those very questions.

### I. PLAIN LANGUAGE OF THE CBA

In his award, Rinaldo summarized both parties' positions and then outlined the applicable rules and policies that prohibited Beller from coming to work or working under the influence of alcohol. Docket Item 1-7. Those included the Plant Rules described above, a substance abuse policy in the employee handbook, and the drug and alcohol

6

policy of Niagara's parent company, Alfa Laval. *Id.* at 18. All those policies provided that if an employee came to work—or worked—under the influence of alcohol, he or she would be subject to disciplinary action, which might include immediate termination. *Id.*

The two relevant sections of the CBA are Section 6(A) and 6(B). Section 6(A) provides that Niagara cannot discipline or discharge an employee without proper cause:

> Subject to the provisions of this agreement, the Company shall have the right to . . . **discipline or discharge for proper cause**, transfer or lay off employees because of lack of work or other legitimate reasons, it being understood, however, **the Company shall not discipline or discharge an employee except for proper cause** . . . .

Docket Item 1-3 at 11 (emphasis added). Section 6(B) gives Niagara the authority to "**establish, maintain and enforce** reasonable rules and regulations to assure orderly plant operations," as long as those rules do not conflict with the other provisions in the CBA. *Id.* (emphasis added). More specifically:

> The Company shall have the right to **establish, maintain and enforce** reasonable rules and regulations to assure orderly plant operations, it being understood and agreed that such rules and regulations shall not be inconsistent or in conflict with the provisions of this agreement.

Docket Item 1-3 at 11 (emphasis added).

Niagara argues that Rinaldo's analysis of proper cause was inappropriate because Section 6(B) gives Niagara the power to determine punishments for violations as long as those punishments are reasonable. But Niagara ignores the connection between Section 6(B) and Section 6(A), while Rinaldo's analysis in the arbitration award correctly connects the two sections. Because the rules or policies promulgated under Section 6(B) must comply with the other provisions of the CBA, the rules and policies concerning discipline are subject to the proper cause standard in Section 6(A). Docket Item 1-7 at 18. In other words, while an employee *may* be terminated for certain

7

infractions, that does not mean that the employer has carte blanche to terminate for those infractions. Instead, the discipline imposed still is subject to Section 6(A)'s proper cause standard.

Indeed, as Rinaldo noted, the proper cause standard was "the *only* negotiated disciplinary standard between the parties." *Id.* (emphasis added). Because proper cause was the only bargained for standard, any disciplinary action administered by Niagara—including termination—must comport with it. *See id.* The CBA therefore required Rinaldo to analyze whether Beller had been discharged for proper cause. And in his arbitration award, Rinaldo explicitly stated that "[a]ny discipline administered by the Company for violation of its Substance Abuse policy or, for that matter, the Alfa Laval Drug and Alcohol Policy must comport with the just cause standard." Docket Item 5-2 at 33. Because the CBA granted Rinaldo the authority to conduct a proper cause review of Beller's discharge, he did not overstep his bounds during the arbitration.

What is more, by framing the questions submitted to the arbitrator as they did, both parties implicitly agreed that the arbitrator might find Beller's termination not to have been for proper cause. Indeed, by asking what the appropriate penalty would be if termination were not for proper cause, both parties well understood that the arbitrator might find that Beller was terminated without proper cause. The fact that Niagara may have been surprised by the arbitrator's decision does not make the decision beyond his authority—especially when his explicit authority was to answer the very questions he answered.

Niagara argues that if it cannot determine the punishment necessary to enforce its rules, then Section 6(B) becomes meaningless. But Niagara is incorrect. Section

8

6(B) gives Niagara the authority to *enforce* its rules, not to unilaterally decide the proper punishment for violations. Stated another way, just because Niagara has the authority to create and enforce reasonable rules, does not mean it also has the authority to unilaterally determine the disciplinary consequences for violations of those rules. Niagara can enforce a rule—that is, it can ensure that there are consequences for violating a rule—without determining the particulars or severity of those consequences.

Given the plain language of the CBA, Niagara correctly notes that the Plant Rules may not be inconsistent or conflict with the other provisions in the CBA. Docket Item 23. Niagara then argues that allowing an arbitrator to review a termination based on an "intolerable violation" would render Section 6(B)—the provision giving it the authority to make and enforce rules—meaningless. That argument not only lacks merit as discussed above, it also creates the very problem it purports to solve. Under Niagara's interpretation, "intolerable violations" in the Plant Rules define proper cause for termination. But the CBA does not authorize Niagara to unilaterally define proper cause. So prohibiting an arbitrator from reviewing a termination for proper cause would render Section 6(A)—the provision precluding discipline or dismissal except for proper cause—meaningless.

Some examples illustrate the potential absurdity of Niagara's position. The Plant Rules here included several intolerable violations in addition to "working while impaired by alcohol or drugs": 1) "use or sale of any alcoholic beverage"; 2) "stealing or appropriating for personal use without express permission property of the Company"; and 3) insubordination, which is defined as "defiance of established authority or willful

9

failure or refusal to obey a supervisor or member of management's order."  Docket Item 1-4 at 1-2.

If Niagara could unilaterally decide that any violations of those provisions were proper cause for discharge—that is, decide which violations an arbitrator ***must*** find constitute proper cause for discharge—Niagara would have unchecked power to dismiss employees regardless of the severity of the infraction.  For example, an employee who brought in champagne to toast a coworker's engagement and had a sip could be fired without an arbitrator's review.  Likewise, an employee who took home a company pen without permission could be unilaterally terminated without an arbitrator's review.  And an employee who refused to get his boss's lunch could be terminated for insubordination without an arbitrator's review.  Such extreme consequences for minor violations would be insulated from review by an arbitrator if Niagara's interpretation of the CBA were correct.  Their absurdity simply underscores that the CBA contemplates an arbitrator's review of an employee discharge for proper cause even when that discharge resulted from what company rules call an "intolerable violation."

## II.     SECOND CIRCUIT PRECEDENT

Second Circuit case law compels the same result.  Proper cause, sometimes stated as "just cause," is a term of art.  If not defined explicitly in a CBA, it is a term left purposefully to an arbitrator's review.  In *First National Supermarkets, Inc. v Union Local 338*, 118 F.3d 892 (2d Cir. 1997), the Second Circuit recognized exactly that when it found that provisions in CBAs allowing companies to establish, maintain, and enforce rules do not give companies the unilateral authority to decide punishment or invalidate proper cause provisions in those CBAs.

10

In *First National*, an employee was terminated for reporting to work under the influence of prescription drugs and alcohol. 118 F.3d at 893-94. The CBA allowed the company to promulgate a rule that prohibited using drugs on the job and provided that using drugs while on the job could result in immediate termination. *Id.* at 894. After the employee's termination was submitted to arbitration, the arbitrator found that the employee had engaged in "egregious misconduct" and had violated the company's rules. *Id.* at 895. But the arbitrator also found that even though the CBA gave the company the authority to promulgate and enforce a rule prohibiting the use of drugs on the job, the "CBA . . . did not empower [the company] to determine unilaterally that the violation of those rules necessarily constituted just cause for discharge." *Id.* And the arbitrator therefore concluded that the company rules defining proper cause for immediate discharge exceeded the company's authority under the CBA, even if a violation of those rules "might automatically qualify as [proper] cause for discharge." *Id.*

In reviewing the CBA in *First National*, the Second Circuit found that it permitted discharge of employees only for proper cause but did not define proper cause. The Second Circuit held that under such circumstances, "and where the CBA authorizes the arbitrator to resolve disputes concerning the interpretation or application of its terms, it remains for the arbitrator to determine whether a discharge was for [proper] cause." *Id.* at 896 (citations and quotations omitted). If the company wished to have the "unquestionable right to discharge an employee for any specified conduct," the Second Circuit said, the company "needed to negotiate for recognition of that right in the CBA." *Id.* Because the arbitrator in *First National* acted within his authority, the Second Circuit upheld the arbitral award of reinstatement. *Id.* at 897.

11

The remarkably similar facts here require the same result. As in *First National*, the CBA gave Niagara the authority to promulgate and enforce rules. *See id.* But as in *First National*, that provision did not give Niagara the authority to determine the disciplinary consequences for violations and to unilaterally decide that certain violations constitute proper cause for immediate termination. *See id.* As in *First National*, if Niagara had wished to have the "unquestionable right to discharge an employee for any specified conduct," it "needed to negotiate for recognition of that right in the CBA," something it did not do. *See id.* So in *First National* and here, because the CBA required proper cause for an employee's termination, even the termination of an employee who committed what plant rules called an "intolerable violation" may be reviewed by an arbitrator for proper cause. *See id.* In other words, just as the CBA in *First National* did not insulate proper cause from arbitral review, the CBA here does not authorize Niagara to unilaterally determine which violations constitute proper cause for immediate termination.

Niagara cites *Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Int'l Union*, 76 F.3d 606, 610 (4th Cir.), *cert. denied,* 519 U.S. 822, 117 S. Ct. 80, 136 L.Ed.2d 38 (1996), to support its argument. *Mountaineer Gas* held that "when the collective bargaining agreement reserves to management the right to make and enforce disciplinary rules, any rules or policies promulgated in accordance with that authority are

thus incorporated into the collective bargaining agreement and have the force of contract language." *Id.* But in *First National*, the Second Circuit found that

> the court in *Mountaineer Gas* drew this rule of law from *General Drivers, Warehousemen & Helpers Local Union 968 v. Sysco Food Services*, 838 F.2d 794, 796 (5th Cir.1988), which ***involved a collective bargaining agreement whose "management rights" clause explicitly provided that the Company had the right "to make and enforce rules and regulations and that violation thereof may be just cause for the discipline or discharge of employees."*** The clause also stated that ***"[t]he only question which may be the subject of a 'grievance' is whether or not the disciplined employee did or did not engage in the specific conduct which resulted in the disciplinary action."***

*First National*, 118 F.3d at 895 (emphasis added). The Second Circuit found that the management-rights provision of the *First National* CBA "was far more circumscribed, and in no way suggested that violation of the work rules would automatically constitute just cause for dismissal." *Id.* at 897. Therefore, the Second Circuit "[did] not apply the rule set forth in *Mountaineer Gas* to the provisions of this CBA," *id.* at 897, and this Court follows suit.

### III. PUBLIC POLICY

Niagara also argues that reinstatement of an employee who showed up to work impaired by alcohol is against public policy. But case law also belies Niagara's public policy argument. In the context of a CBA, the Supreme Court has made clear that to tip the balance, the "public policy must be 'explicit,' 'well defined,' and 'dominant.' It must be ascertained by reference to the laws and legal precedents not from general considerations of supposed public interest." *E. Associated Coal Corp. v. United Mine Workers of America, District 17*, 531 U.S. 57, 63 (2000) (internal quotations and citations omitted). In fact, the Supreme Court could not find "a single decision, since [it] washed its hands of general common-lawmaking authority, in which [it has] refused to

13

enforce on 'public policy' grounds an agreement that did not violate, or provide for the violation of, some positive law." *Id.* at 68 (Scalia, J. concurring).  Thus, when considering whether an arbitrator's award reinstating an employee violates public policy, the question is not whether the discharged employee's conduct violated public policy but whether the arbitrator's decision to reinstate the employee does so.  *Id.*

In *United Mine Workers*, the Supreme Court found that an arbitration award to reinstate an employee who operated a truck under the influence of drugs did not violate public policy.  *Id.* at 65-66.  The Court held that the award violated no specific provision of any law or regulation and was consistent with the Department of Transportation rules requiring completion of substance-abuse treatment.  *Id.* at 66.  The Court noted that the award did not condone the employee's conduct or ignore the risk to public safety that drug use by truck drivers may pose.  *Id.* at 65.  Because the award, among other things, suspended the employee for three months—depriving him of nearly $9,000—it punished the conduct sufficiently to deter driving while impaired.  *Id.* at 65-66.

The Second Circuit has applied this precedent to enforce arbitration agreements or awards in situations much more dangerous than a welder working under the influence of alcohol.  For example, the Second Circuit has upheld an award reinstating an employee who worked at a nuclear power plant while impaired by drugs.

> There can be no doubt . . . that there exists a strong public policy in favor of promoting a safe, drug-free working environment in the nuclear power industry. . . .  [T]he existence of extensive federal legislation governing safety in the nuclear power context, as well as Congressional authorization for a specific agency, the Nuclear Regulatory Commission, to oversee and ensure nuclear safety, reflects 'the level of public concern of the safety of the nuclear power industry.'

*Int'l Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 718 (2d Cir. 1998).  Even so, the court found that is was "bound to uphold an arbitration

14

award that does not squarely contradict public policy as defined by the Nuclear Regulatory Commission regulations." *Id.* at 728. And if reinstatement of a nuclear power plant employee who worked while impaired by drugs is not precluded by public policy, then the same is true of the reinstatement of a welder who worked while impaired by alcohol.

## **CONCLUSION**

Because the arbitrator's award was grounded in the CBA bargained for by both parties, and because the award does not offend public policy, this Court will not revisit it. For that reason, the Court declines to adopt the R&R, Docket Item 19, and Niagara's petition is DISMISSED. The Clerk of Court shall close the file.

SO ORDERED.

Dated: September 14, 2018
Buffalo, New York

*s/Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE